The opinion of the court was delivered by
White, J.
Montegut, one of the defendants in this cause, was the owner of two notes of Labranche, secured by vendor’s privilege, for $3500 each, as evidence of a part of the credit price of a sale of a plantation made by him to Labranche, on the 13th November, 1867a duly recorded on the 18th November, 1867. These notes were merged to judgment against Labranche on the 21st January, 1874, with recognition of vendor’s privilege and mortgage. At a tax sale made by the tax collector of the parish in which the property was situated, on the 17th December, 1874, Montegut became the adjudieatee, for $1600 in cash» the sale being duly recorded in December, 1874, and a deed was made by the Auditor to Montegut on the 26th of July, 1875. On 14th January, 1876, by public act, Labranche ratified the tax sale of 12th December, 1874, and the Auditor’s deed of July 26th, 1875. The plaintiffs, as holders of two mortgage notes of Labranche, identified with an act recorded the 21st February, 1873, instituted on the 23d November, 1877, the present action against Labranche and Montegut, against the former as their debtor, and against Montegut as a third possessor. They allege the absolute nullity of the tax title to Montegut, without asking it be so recognized, and pray that Montegut be condemned to give i property or pay the debt by them held.
The reasons upon which the demand of plaintiffs is founde substance, that the tax sale to Montegut being an absolute : *840 not have the effect of freeing the property from mortgages. Second, that Montegut not having reinscribed his mortgage whilst in possession as owner, it perempted on the 18th of November, 1877, -and hence that their claim is first in rank.
As to the absolute nullity of the tax sales, we think the pretension at best very doubtful. The constitutional provision giving to all tax sales prima facie validity would seem in terms to be a negation of the idea of an absolute nullity when applied to tax sales having a semblance of being, for the proposition that an act must at one and the same time be held prima facie good, and yet be considered as never existing, is a bald contradiction in terms. Nor does the re ence made by counsel to the opinion of Judge Cooley as to the burden of proof help the fallacy — for if the burden be in favor of the sale, and its validity is to be held sacred until shown to be informal, it would seem that such fact alone whilst leaving room for a relative, would exclude the conception of an absolute, nullity.- Be this, however, as it may, as to which we express no opinion, it is manifest that the sale in controversy can not be considered as absolutely null. Even if the latent informalities had been such as to give it that nature or want of nature, it has been formally ratified by the owner, and that ratification made it, if it were primordially null, thereafter so only as to the rights of others; in other words relatively so. This view would furnish just ground for the dismissal of' plaintiffs’ suit, for if • the tax sale be simply voidable, the revocatory action should have been resorted to, but as no exception has been taken to the method of procedure, and as both parties have apparently tried the case as if this were a revocatory action, in order that there may be an end to this litigation we will determine the matters presented. The sale to Montegut, then, under the view we have taken, being, if voidable at all, only so to the extent that it prejudiced plaintiffs’ rights, the first inquiry which presents itself is, did it so prejudice them in any way ? The evidence discloses that Montegut at the time of the sale was the ranking mortgage creditor, holding a claim for over $8900, and that at the tax sale he paid as the purchase p rice $1600 taxes claimed by the State, that then, since, and now, the property was and is worth less than one third the claim of Montegut. Granting, then, the informalities upon which plaintiffs rely, how have they been injured by them? What benefit'could they derive from an annulment of the sale? The jurisprudence of this State has long since consecrated the galutary doctrine that courts exist to enforce rights and redress wrongs, that they will not lend their aid to the annulment of titles where rty seeking their interposition can -not possibly take relief from nting of the remedy invoked. Copeland vs. Labatut, 6 A. 61; vs. Emerson, 8 A. 503. But plaintiffs contend that they have *841 an interest in the avoidance of the sale ; that Montegut failed to rein-scribe his mortgage since the tax sale and possession by him of the property; and hence, if the sale be set aside, they will become the ranking creditors and take the proceeds of the property. Is the position tenable under our law or under the law, of France, which they specially invoke? We think not. @ur Code provides, in art. 3409, which is similar to C. N. 2147 :
• “ The servitudes and incorporeal rights which the third possessor holds on the property before his possession of it are revived after his relinquishment, or after the sale under execution made upon him.”
Under this unambiguous provision, were Montegut evicted, by the benevolence of the lawmaker would come the restitutio ad integrum. The annulment or recision of the sale would have the effect of placing the parties in the position they held before the sale, each party being restored to the rights he then had, and abandoning those which had ineffectually been transported to him. Solon, vol. 1, pp. 62, 63, 64. Larombier, vol. 2, pp. 286, 287, 288. Restitutio ita facienda esl ut unusquis que integrum jus suum recipiat. L. M, C. de minoribus. These principles are the outcome of natural justice, and are dictated by'the wise motive that courts may not be made the instruments of injustice by lending their aid to enrich one man at the expense of another. Give restitution, and, by the proof in the record, plaintiffs could take nothing from annulling'the sale. Plaintiffs, however, say, grant these principles, yet Montegut can not be restored to the mortgage rank he had at the time of the sale, because of non-reinscription. We can not take one provision of law, that which dictates reinscription, and abandon every other. We must construe the whole Code as one statute, harmonizing its provisions, and enforce them all; as well those which say that one can hot acquire or have a mortgage on his own property and that which provides the restitutio in integrum as, also, the one pointing out the necessity of reinscription. In fact, the principle that no one can mortgage unto himself his own property is axiomatic, res sua nemine servit and to say that one must reinscribe against himself would be compelling the doing of that which the law says can not be done. Under our system, a forced sale or adjudication operates, as it were, a purgation of the mortgages on the property sold, so that at the very moment of sale the rights of parties are fixed, unless the sale for some cause be rescinded. The rights being fixed, the reason for inscription ceases. It would be, indeed, an inequitable system which would allow a creditor whose rights against the proceeds would entitle him to nothing to lie in wait for the unsuspecting owner, and when the useful time for reinscription had passed take, by way of action in nullity, that which he could not have obtained by the timely assertion of his rights. Although we ar *842 informed of no principle upon which such an inequitable theory could be sustained, we are told that the jurisconsults and writers of France recognize and enforce it, their law being, it is claimed, like unto our own.
The view, however, taken of the French law by counsel is, we think, entirely erroneous. In France, as in this State, a forced sale under adjudication has the effect of determining the rights of mortgage creditors, and the creditors are no longer entitled to follow the property, except for the quantum of proceeds resulting from the sale, to which their rank at the date of sale entitles them, either by inscription or reinscription. This determination there as here dispenses from reinscription. Troplong, Hypo. no. 720; Grenier, vol. 2, no. 243. “ It is a rule,” says Troplong, foe. cit, “ of unvarying application that whenever a mortgage passes from the position of a real right to that of a right on the price, all the rights of preference immediately and by the force of things revert to this price.”
Says Paul Pont, Hypo. no. 1056: “ In the case of forced expropriation, we hold, with the majority of. authors, and with the prevailing jurisprudence, that it is on the day that adjudication is made that the hypothecary inscription produces its effect as regards the creditors, between themselves and the adjudicatee.” The same author says, at no. 1279 and 1280, that the reason of the rule is that a sale made with the formalities required by law for forced sales is presumed to bring a just price. But there is another system in France, unknown to our Code, of freeing property from mortgage, and which is called purgation and surrender. It is these provisions which have misled counsel, and by the light of which the authorities so elaborately quoted must be read, in order to their proper understanding. The systems to which we refer are those recognized in art. 2180, par. 3, O. N., as a means of extinguishing mortgages “ by the fulfilling of the formalities and conditions prescribed to third persons for purging the property acquired by them.” The rules under which the purgation is to be had are found in O. N. 2180 to 2185, inclusive. They give the right to any mortgage creditor who offers an additional price for the mortgage property to compel the purchaser to re-offer it at auction ; and a method is provided for distributing the price. This system has given rise to several .disputed questions; one of which was, whether the mortgage creditor who becomes owner by purchase or other voluntary title of the property mortgaged to himself and to other creditors of his author, and who has failed to reinscribe his mortgage within ten years, preserves his rank as a mortgage creditor notwithstanding his failure to reinscribe, if either under the hypothecary action or proceedings for purgation he ceases to be the owner and some other becomes the adjudicatee.
*843 ¡The answers oí courts and authors have been severally in the negative, because, until the final adjudication of the property and the conclusion of the purgation proceedings the third possessor had and knew he had only a precarious title, which at any time might be destroyed* under the law if a higher bidder than himself could be found among-his co-mortgagees or third persons. Thus, having nothing but a defeasible title, in order to protect his rights as a mortgage creditor,, which he might be called on to exercise at any moment, he should rein-scribe, evén if the time for making the reinscription should be reached during his precarious possession. It is only when the mortgage has produced its effect by final adjudication or purgation that the obligation toreinscribe ceases, and it is this doctrine of reinscript-ion under the system of purging a property from mortgage which is referred to by Paul Pont, Hypo, nos 1215,1054, and, incidentally, by Pothier, as, also, Troplong, Hypo. no. 726, Us, and the eases of Billoueh vs. Samson and Dupre vs. Tongievis, quoted by counsel for plaintiff.
Paul Pont, at no. 1215, in saying that an evicted third possessor could only exercise his right of mortgage when he had reinseribed, refers to his proceeding, nos. 1054 and 1062, and in no. 1054, after laying-down the true principle as to recording, says the necessity of reinseription exists as long as the original inscription has not produced its effect. Such, also, is the doctrine of Pothier, who, under the ancient law, taught-that a mortgage creditor who acquired the mortgaged property was in danger of being primed by creditors of inferior dignity, unless he took the steps required by law to-secure his proportion of the proceeds.
In referring to this view, Pont well adds that now that the law of mortgages is founded on the principle of publicity, for a greater reason than formerly must it be said that a mortgage creditor who acquires the mortgaged property preserves his mortgage on it until he has purged it only by inscriptions made and renewed according to law.
How completely our conclusion harmonizes with these views is obvious when it is considered that under the ancient and modern French law the purchaser’s rights were not fixed by an ordinary adjudication, he being compelled by the one, in order to secure his claim, to-oppose his right to the fund produced by his bid, and by the other to resort to the procedure of purgation. In other words, under both systems the existence of a final judicial adjudication was a test as to the necessity of reinseription.
This idea is clearly conveyed by Pont, no. 1062, where he says: “ The effect of the mortgage being produced, the necessity of renewing the inscription ceases only at the time of the final adjudication or of the offer authorized by article 2173.” Troplong, Hypo. no. .726, Us, quoted by counsel, and at nos. 726 and 720, not quoted, holds the same doctrine) *844 namely, that as the third possessor, under the system of purgation, has only a precarious tenure, being liable to eviction by the other creditors, “ 7ie must until he has purged the property according to law reinscribe his mortgage up to the time of adjudication in order to preserve it from peremption.” Thus the writers upon whose opinion plaintiffs’ counsel rely to sustain their position directly and in terms refute it. Nor is the jurisprudence of France, which is relied on, any more favorable to their proposition. In the cases cited, Dupre vs. Tongievis, Cassation, February 5,1828, Journal du Palais, vol. 21, p. 1133, and Billouch vs. Lambert, (Samson) Cassation, May 1,1828, Journal du Palais for 1828, 1428, the doctrine held is that the reinscription is required in default of purging, according to law. In fact, the synopsis of the last case expressly says “that the third possessor must, if he does not fulfill the formalities of purging, renexo the inscription in order to preserve his hypothecary rank.” The very cases, then, which are quoted destroy the doctrine they are cited to establish, a forced sale under oxer law is a purgation.
Even in France, where the system of purgation exists, an overwhelming line of authority teaches that'where there has been a final adjudication in its nature dispensing with purgation reinscription ceases to be necessary. In Bonvait vs. Macon, J. P. vol. 22, p. 889, it was held by the Royal Court of Grenoble that the hypothecary inscription has attained its object by the final adjudication of the mortgaged immovable, and that, in consequence, it is not necessary, to avoid losing priority, to renew the inscription, the ten years of which only end after the final adjudication of the mortgaged property; and in the case of Enregistrement and Demailly vs. Duretz, July 7,1829, p. 1204, Journal du Palais, 22, it was held by the Court of Cassation “ that the mortgage creditor who becomes the adjudicatee of the immovable encumbered by his mortgage is not obliged, in order to preserve his hypothecary rank, to renew his inscription within ten years from its date, and that the recording has produced its whole effect from the day that the judgment of final adjudication of the mortgaged property has become irrevocable; and see numerous cases quoted in note to this decision; and, also, Paris, August 21, 1862; J. P. for 1863, p. 621; Bordeaux, November 19, 1868; J. P. for 1869, p. 578; Paris, March 24, 1860 ; J. P. for 1860, p. 922.
Our conclusion, then, is, that the necessity for reinscription in order to preserve the rank of Montegut’s mortgage did not exist; that if we were to annul the tax sale by restitution, the entire proceeds of a new sale would be attributable to Montegut, whose mortgage- largely exceeds the value of the property; that, hence, the plaintiff, whose cause of action depends upon injury to his rights, is ryithout reason of *845 complaint, and can not invoke the aid of courts to undo that which judicial machinery would immediately restore.
It seems there was a tract of land in rear of the plantation which did not pass to Montegut by the tax sale, and we do not, therefore, consider that it is covered by the decree we shall render.
It is therefore ordered, adjudged, and decreed that the judgment of the lower court be reversed, and, proceeding to render such judgment as should have been pronounced below, it is decreed that there be judgment, in favor of Lucien Montegut and against plaintiffs recognizing the property included, in the tax sale herein above referred to as the property of Lucien Montegut, free from the mortgage asserted by plaintiffs. The costs of both courts to be paid by plaintiffs.
The parties to this cause have by written consent on application for rehearing, asked a modification of the decree previously rendered, in order to correct an oversight as to the parcel of land not included in the tax sale. We grant the rehearing, therefore, in order to enable us to modify our decree.